UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM HORTON, JR.,

Petitioner,

v.

JEFFREY A. UTTECHT,

Respondent.

CASE NO. 3:20-cv-05138-BHS-JRC

REPORT AND RECOMMENDATION

NOTED FOR:  September 18, 2020

The District Court has referred this petition for a writ of habeas corpus to the undersigned, as authorized by 28 U.S.C. § 636(b)(1)(A)–(B) and local Magistrate Judge Rules MJR3 and MJR4.  Petitioner filed the petition pursuant to 28 U.S.C. § 2254.

In 2012, petitioner shot and killed Charles Pitts and was charged with first degree murder and unlawful possession of a firearm.  In 2014, a jury convicted petitioner of the firearm offense but was unable to reach a verdict on the murder charge.  Upon re-trial on the murder charge, the jury convicted petitioner and concluded that the murder was for the benefit of a street gang, which is an aggravating factor for sentencing purposes.  Petitioner now argues that his trial

counsel rendered ineffective assistance by failing to challenge the constitutionality of an out-of-state offense that formed the basis for his firearm conviction.  He further argues that there was insufficient evidence to convict him of the street gang aggravating factor.

The Court disagrees on both counts.  First, petitioner's counsel reasonably challenged the use of the out-of-state offense on other grounds, and petitioner fails to show that the state court unreasonably determined that his counsel's performance was not deficient in this regard.  Second, there is circumstantial evidence from which a rational jury could reasonably conclude that when he shot Pitts, petitioner intended to advance the reputation of a gang.  So there was sufficient evidence supporting the jury's finding of an aggravating factor.  The habeas petition should therefore be denied.

## FACTUAL HISTORY

### I.  Procedural History in Federal Court

Petitioner, who is represented by counsel, instituted this matter in February 2020.  Dkt. 1.  In his amended petition, petitioner asserts two grounds for relief:  (1) that his trial counsel rendered ineffective assistance by failing to challenge the constitutionality of the out-of-state offense that formed the basis for the firearm conviction and (2) that there was not sufficient evidence to prove the street gang aggravating factor.  *See* Dkt. 4.  Respondent has filed the state court record and his answer to the petition, and the matter is ripe for consideration.  *See* Dkts. 8, 9, 12.

### II.  State Court Proceedings

The state court record filed by respondent sets forth the following events.

In 2014, a jury found petitioner guilty of first-degree unlawful possession of a firearm based on, among other things, the prior, Florida offense.  *See* Dkt. 9-1, at 2.  The jury was unable

1   to reach a verdict on a second count of murder, so that the State retried petitioner later in 2014,

2   resulting in a guilty verdict for first degree murder as well as a special verdict finding that the

3   State had proved the street gang aggravating factor. *See* Dkt. 9-1, at 2, 178.  The sentencing court

4   later imposed a 481-month total sentence, including an exceptional sentence for the murder

5   conviction.  *See* Dkt. 9-1, at 6.

6         Petitioner appealed his convictions and in July 2016, Division Two of the Washington

7   State Court of Appeals affirmed.  Dkt. 9-1, at 170.  The Court summarized the facts underlying

8   petitioner's convictions as follows:

9         In the early morning of October 24, 2012, police responded to a dispatch
10   call.  Dispatch reported that shots were fired and that a witness saw a black male
     dragging another black male toward the street.  When Sergeant Matt Brown and
11   Officers Ryan Moody, Timothy Borchardt, and Noah Dier arrived, they observed
     what they later discovered to be the dead body of Charles Pitts in the middle of the
     parking lot.
12         Before the officers could approach the body, a man, later identified as
     Horton, ran into the parking lot carrying a gun and yelling.  Horton yelled, "I'm
13   going to kill you, m*****f***er" and stood over the body. . . .   The police
     announced their presence and ordered Horton to get on the ground.  Horton obeyed,
14   dropped the gun, and got down on the ground next to the body.  The police placed
     him in handcuffs.  Horton was wearing a Chicago Bears jacket.  Pitts's shirt was
15   partially pulled over his head, and there was a bullet hole below his naval and a
     bullet hole in his chest.  The police took the gun Horton dropped into evidence and
16   noted the chamber was partially open with a bullet casing lodged inside.  [Footnote
     omitted.]
17         While officers placed Horton in handcuffs, Horton said to an officer,
     "They're not involved.  I'm the only suspect.". . .  Horton appeared to be referring
18   to people standing outside nearby apartments.  Horton also looked at the deceased,
     while laughing and stated, "That m*****f***er is dead.". . .
19         Horton was put in Officer Mark Holthaus's patrol car because it had an in-
     car video camera.  Before Holthaus could advise Horton of his *Miranda* [footnote
20   omitted] rights, Horton stated the guy in the parking lot "was part of the Hilltop
     Crips and that's what did it."   Holthaus then read Horton his *Miranda* rights.
21   Horton acknowledged that he understood his rights, but Holthaus did not question
     him.  According to one officer, before Horton got in Holthaus's car, Horton told
22   officers his leg and back were injured.  The video of Horton in the back of the car
     was later admitted into evidence at Horton's trial and viewed by the jury.
23         Holthaus transported Horton to the police station where Investigator Sean
     Conlon took custody of him. At the station, Conlon read Horton his *Miranda* rights
24

REPORT AND RECOMMENDATION - 3

a second time and then conducted a video recorded interview after Horton indicated he understood his rights and was willing to waive his rights and talk. Horton admitted to shooting Pitts, but at times throughout the interview he indicated it was in self-defense.

Officers identified the apartment tied to the events of the night and secured it, along with the tenant, Baron Johnson, who was standing nearby or inside the apartment. Officer Moody noted blood on the floor by the entryway. He also smelled a "fairly strong" odor of marijuana. . . . The blood indicated something had been dragged from inside the apartment to the outside. Two spent shell casings were located inside the apartment. Officers also recovered a black bag from the parking lot near where Pitts's body was found and where Horton had been taken into custody. The bag contained marijuana and ten blue tablets, which appeared to be Ecstasy. [Footnote omitted.]

In events leading up to the shooting, Horton, Johnson, Gregory Borja, Anthony Ross, and Alonza Williams gathered at Johnson's apartment. After drinking and barbequing at the apartment, the group went to a night club. Johnson and Borja saw Pitts outside of the club. Johnson and Ross also saw Horton with a gun at some point that day.

The group drank and stayed at the club until about 1:30 A.M., when they returned to Johnson's apartment. Horton, Ross, Borja, and Williams rode in a car together. Pitts also showed up at the apartment shortly after the group arrived.

According to Johnson, Horton wanted to "slap box" with Pitts. . . . Borja said that everyone was having a good time, and Horton and Pitts were briefly slap boxing but were playing around. Borja thought that Pitts "got the better hand" of Horton once. . . . Ross said that Horton and Pitts were in each other's faces and "smack talking.". . .

Horton and Pitts were intoxicated. Johnson described Horton's level of intoxication at the club earlier as "pretty up there," and confirmed that meant drunk. . . . He had heard that Horton was on Ecstasy but did not see him take it.

According to Horton, he did not slap box with Pitts. Horton said Pitts came into the apartment and began calling him "cuz.". . . Pitts asked him about his Chicago Bears jacket, its black and orange colors, and whether he was a "Hoover." [Footnote omitted.] Horton stated that Pitts remarked on the colors of Horton's jacket in "his neighborhood" and asked him, "What you doing with the colors on over here, Cuz; are you from Hoover or something?". . . Pitts hit Horton, and Horton stated, "I've never been hit that hard in my life. It was one of those hits that I remember to this day. I ain't never been hit like that.". . . About a week before Pitts's death, Horton saw Pitts beat up another person to the point where the other guy's "face looked like a punkin.". . . Horton said, "I knew what this man was capable of and I was in fear for my life. I believe that man said he was going to kill me.". . .

Johnson went into his bedroom. At some point shortly thereafter, Borja got a bad feeling when Horton began talking about being a Black Gangster Disciple (BGD) from Chicago and thought it was time to go. Borja, Ross, and Williams left the apartment.

While Johnson was in his bedroom, Horton shot Pitts in the living room. Johnson did not see the first shot but said he ran into the living room to see smoke coming out of Pitts's abdomen and Horton shooting Pitts again. Johnson believed Horton said, "You can't do nothing to me now. You're dead," before shooting Pitts again three more times. . . . Horton was not wearing shoes or a shirt.

According to Horton, Johnson told him to get Pitts out of the house. Horton told Johnson he would take care of it and began to drag Pitts outside. Horton came back to the apartment to get his shoes and jacket, and when he ran back to Pitts in the parking lot, the police had arrived.

Dkt. 9-1, at 171–74 (citations to the record omitted).

In affirming the matter, Division Two rejected, among other things, petitioner's argument that there was insufficient evidence to convict him because the Florida conviction was a "withheld adjudication" that could not form the basis for the crime of unlawful possession of firearm. *See* Dkt. 9-1, at 182. The Supreme Court denied discretionary review of Division Two's opinion. Dkt. 9-1, at 281.

Petitioner then sought collateral review by filing a personal restraint petition ("PRP") in Division Two, arguing, among other things, that his trial counsel was ineffective for failing to challenge the constitutionality of the Florida conviction and that there was not sufficient evidence to support the gang aggravator regarding the first degree murder conviction. *See* Dkt. 9-1, at 408, 419. Again, Division Two disagreed, and the Court denied petitioner's PRP. Dkt. 9-1, at 415. The Supreme Court then entered a ruling denying review. Dkt. 9-1, at 454.

## EVIDENTIARY HEARING

The decision to hold a hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before

1   the state court. *Cullen*, 131 S.Ct. at 1388. A hearing is not required if the allegations would not

2   entitle petitioner to relief under 28 U.S.C. § 2254(d). *Landrigan,* 550 U.S. at 474. "It follows

3   that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a

4   district court is not required to hold an evidentiary hearing." *Id.*; *see also Cullen,* 131 S. Ct.

5   1388 (2011). The Court does not find it necessary to hold an evidentiary hearing because, as

6   discussed in this report and recommendation, petitioner's grounds for relief may be resolved on

7   the existing state court record.

8                                         **DISCUSSION**

9        **I. Standard of Review**

10       The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation

11  of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in

12  [28 U.S.C.] §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

13       The first exception, § 2254(d)(1), allows habeas relief on the basis that an adjudication

14  "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

15  established Federal law, as determined by the Supreme Court of the United States." The

16  Supreme Court has ruled that a state decision is "contrary to" clearly established Supreme Court

17  precedent if the state court either (1) arrives at a conclusion opposite to that reached by the

18  Supreme Court on a question of law, or (2) confronts facts "materially indistinguishable" from

19  relevant Supreme Court precedent and arrives at an opposite result. *Williams v. Taylor*, 529 U.S.

20  362, 405 (2000).

21       Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply

22  because that court concludes in its independent judgment that the relevant state-court decision

23  applied clearly established federal law erroneously or incorrectly. Rather, that application must

24

1    also be unreasonable." *Id.* at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An

2    unreasonable application of Supreme Court precedent occurs "if the state court identifies the

3    correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts

4    of the particular state prisoner's case." *Williams*, 529 U.S. at 407.  In addition, a state court

5    decision involves an unreasonable application of Supreme Court precedent "'if the state court

6    either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

7    where it should not apply or unreasonably refuses to extend that principle to a new context where

8    it should apply.'"  *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529

9    U.S. at 407).

10             The second § 2254 exception, § 2254(d)(2), provides for habeas relief if the adjudication

11    "resulted in a decision that was based on an unreasonable determination of the facts in light of

12    the evidence presented in the State court proceeding."  Federal habeas courts must presume the

13    correctness of state courts' factual findings unless applicants rebut this presumption with "clear

14    and convincing evidence."  28 U.S.C. § 2254(e)(1).  Further, review of state court decisions

15    under §2254(d)(1) is "limited to the record that was before the state court that adjudicated the

16    claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

17         **II.  Ground One:  Ineffective Assistance of Trial Counsel**

18             Petitioner's first ground for relief asserts that his trial counsel rendered ineffective

19    assistance by not challenging the constitutionality of the Florida "withheld adjudication" that the

20    State relied upon when it prosecuted petitioner for first degree unlawful possession of a firearm.

21    *See* Dkt. 4, at 6.

22             **A.  Standard of Review**

23

24

1    To prevail on a claim that counsel rendered ineffective assistance, a petitioner must show

2 both that "counsel's performance was deficient" and that "the deficient performance prejudiced

3 the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To show prejudice, a

4 defendant "must show that there is a reasonable probability that, but for counsel's unprofessional

5 errors, the result of the proceeding would have been different." *Id.* at 694.

6    Moreover, when reviewing a habeas claim that counsel rendered ineffective assistance,

7 the Supreme Court has explained—

8    the pivotal question is whether the state court's application of the *Strickland*
       standard was unreasonable.  This is different from asking whether defense
9    counsel's performance fell below *Strickland*'s standard.  Were that the inquiry, the
       analysis would be no different than if, for example, this Court were adjudicating a
10   *Strickland* claim on direct review of a criminal conviction in a United States district
       court.  Under AEDPA, though, it is a necessary premise that the two questions are
11   different.  For purposes of § 2254(d)(1), "an *unreasonable* application of federal
       law is different from an *incorrect* application of federal law."  [Internal citation
12   omitted.]  A state court must be granted a deference and latitude that are not in
       operation when the case involves review under the *Strickland* standard itself.
13       A state court's determination that a claim lacks merit precludes federal
       habeas relief so long as "fairminded jurists could disagree" on the correctness of
14   the state court's decision.  [Internal citation omitted.]

15 *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

16                    **B.  Facts Regarding Withheld Adjudication**

17   The State prosecuted petitioner for first degree unlawful possession of a firearm, a crime

18 requiring the State to establish that petitioner had a firearm "after having previously been

19 convicted or found not guilty by reason of insanity in this state or elsewhere of any serious

20 offense as defined in this chapter."  RCW 9.41.040(1)(a).[1]  The requisite prior serious offense is

21 known as a "predicate offense."

22

23
_____

24    [1] Although RCW 9.41.040 has been amended many times since 2012, the quoted
language has remained the same.

REPORT AND RECOMMENDATION - 8

Petitioner had previously been charged with armed robbery in Florida.  *See* Dkt. 9-1, at 187.  Under Florida law, "[i]f it appears to the court upon a hearing of the matter that the defendant is not likely again to engage in a criminal course of conduct and that the ends of justice and the welfare of society do not require that the defendant presently suffer the penalty imposed by law, the court, in its discretion, may either adjudge the defendant to be guilty or stay and withhold the adjudication of guilt."  Fla. Stat. Ann. § 948.01(2) (2019).  Pursuant to this statute, petitioner had pleaded guilty to armed robbery and the Florida court had entered a withheld adjudication in 1994.  *See* Dkt. 9-1, at 187, 490.

In 2014, before petitioner's first trial, the State informed petitioner that it intended to rely on his Florida withheld adjudication as the predicate offense for his firearm charge.  Dkt. 9-1, at 176.  Petitioner filed a motion to exclude the withheld adjudication.  Dkt. 9-1, at 176.  However, the trial court allowed the evidence, finding that the withheld adjudication would be considered a "conviction" for the purpose of the predicate offense analysis under Washington law.  Dkt. 9-2, at 5.  Petitioner and the State then stipulated to the admission of the records of his Florida withheld adjudication.  Dkt. 9-1, at 385.

On appeal, petitioner argued that the trial court's ruling was incorrect and that a Florida withheld adjudication could not qualify as a predicate offense for his firearm conviction.  Dkt. 9-1, at 182.  Division Two disagreed and held as a matter of first impression that "a plea of guilty combined with a withheld adjudication is a conviction for the purposes of being a predicate offense for unlawful possession of a firearm."  Dkt. 9-1, at 187; *see also* Dkt. 9-1, at 281 (the state Supreme Court's ruling denying review).

Petitioner raised a similar issue in his PRP.  There, he argued that his trial counsel had rendered ineffective assistance by failing to challenge the constitutionality of the Florida

1   withheld adjudication.  *See* Dkt. 9-1, at 418.  Petitioner asserted that his Florida counsel had

2   informed him that his withheld adjudication would never count as a "conviction" and that his

3   guilty plea to the Florida charge was unconstitutional because he would never have pleaded

4   guilty if he knew the true consequences.  *See* Dkt. 9-1, at 420.

5          Division Two disagreed, and the state Supreme Court later denied review.  Dkt. 9-1, at

6   420–21, 457.  In the ruling denying review, the Court did not specifically rule on petitioner's

7   Washington trial counsel's performance regarding failure to challenge the constitutionality of the

8   Florida offense.  *See* Dkt. 9-1, at 456–57.  Therefore, the Court "looks through" to the last

9   reasoned state court decision—Division Two's opinion.  *See, e.g.*, *Van Lynn v. Farmon*, 347

10  F.3d 735, 738 (9th Cir. 2003)

11         **C.  Analysis**

12         Petitioner asserts that Division Two's resolution of his claims was unreasonable because

13  that resolution essentially put the burden on petitioner to inform his Washington trial attorney

14  that his Florida guilty plea was invalid.  Dkt. 12, at 4.  He argues that it was his trial counsel's

15  burden to investigate the circumstances of his Florida conviction in order to determine whether

16  to challenge the constitutionality of that plea.  Dkt. 12, at 5.

17         The Court disagrees that Division Two unreasonably resolved petitioner's argument.  In

18  this area, the Court must be "doubly deferential":  the relevant question "is not whether a federal

19  court believes the state court's determination under the *Strickland* standard was incorrect but

20  whether that determination was unreasonable—a substantially higher threshold."  *See Knowles v.*

21  *Mirzayance*, 556 U.S. 111, 123 (2009) (internal citations omitted).

22         Here, Division Two concluded that although petitioner's Washington trial counsel could

23  have attacked the validity of the predicate, Florida offense, petitioner's evidence and arguments

24

1    in his PRP failed to show that his Washington trial counsel rendered deficient performance in not

2    doing so:

3              Our Supreme Court has held that Horton could have challenged the
         constitutionality of his prior Florida conviction at his Washington trial. *State v.*
4        *Summers*, 120 Wn.2d 801, 809-810, 846 P.2d 490 (1993). Had he done so, the
         State would have then had the opportunity to prove beyond a reasonable doubt that
5        the Florida conviction was constitutionally sound. *Summers*, 120 Wn.2d at 812. . . .
                  . . .
6                 . . . [B]ecause he failed to raise this issue at the trial court, and he has not
         shown the Florida conviction is invalid on its face, our review is limited to whether
7        Horton's defense counsel at the Washington trial was ineffective for failing to
         challenge the constitutionality of his Florida conviction under *Summers*. . . .
8                 In support of his argument, Horton does not, however, identify any evidence
         that his trial counsel was ever aware of the circumstances underlying his Florida
9        guilty plea. Nor has Horton presented any evidence, other than his own statement,
         to support his claim about what his Florida attorney told him. He has not
10       demonstrated that his Washington counsel performed deficiently by failing to raise
         this issue at trial.
11   Dkt. 4-1, at 420–21.

12            Petitioner fails to show that this resolution was an unreasonable application of clearly

13   established federal law. Although defense counsel generally has an "obligation to conduct a

14   thorough investigation of the defendant's background" to discover evidence in mitigation of

15   sentence (*Williams v. Taylor*, 529 U.S. 362, 396 (citations omitted)), counsel may also

16   reasonably decide, based on tactical or other considerations, that a particular investigation is

17   unnecessary or risky. *Strickland*, 466 U.S. at 690–91. "[A] particular decision not to investigate

18   must be directly assessed for reasonableness in all the circumstances, applying a heavy measure

19   of deference to counsel's judgments." *Id.* Here, as Division Two concluded, defense counsel

20   brought a strong argument against the use of the adjudication as a predicate offense—one that

21   raised an issue of first impression in Washington State law—and petitioner has not shown that

22   defense counsel was obligated to further investigate the prior offense in order to levy alternative

23   arguments. *See id.* at 690–91 ("[S]trategic choices made after less than complete investigation

24

1  are reasonable precisely to the extent that reasonable professional judgments support the

2  limitations on investigation."); *accord United States v. Garcia-Yepez*, No. 3:11-CR 00514-JO,

3  2014 WL 3530136, at *2 (D. Or. July 15, 2014) ("Professional standards do not require defense

4  attorneys to investigate the legal predicates for clients' prior convictions.").

5      Moreover, Division Two also reasonably determined the relevant facts, namely that

6  petitioner had come forward with nothing to show that he made his Washington trial counsel

7  aware that his Florida counsel had allegedly misinformed him regarding the consequences of the

8  withheld adjudication.  Indeed, the sole evidence that petitioner provided was his statement

9  that—

10         [w]hen I pleaded guilty and received a withheld adjudication in Florida, I was told
           by my [Florida] attorney that it would not count as a conviction for any purpose.
11         I understood this to mean that I would not lose my right to possess a firearm in
           Florida or anywhere.  If I had known that this was not true, I would not have pleaded
12         guilty.

13  Dkt. 9-1, at 304.

14      But, as Division Two concluded, this statement is entirely silent about the crucial issue:

15  what petitioner told his Washington State trial counsel regarding the withheld adjudication.  *See*

16  Dkt. 4-1, at 420–21.  Petitioner did not provide statements from his Washington or Florida trial

17  counsel or any other evidence tending to support his claims other than the statement set forth

18  above.  Division Two's resolution was not an unreasonable application of federal law.  *See, e.g.*,

19  *Womack v. Del Papa*, 497 F.3d 998, 1002–04 (9th Cir. 2007) (self-serving and conclusory

20  statements insufficient to show ineffective assistance); *Guam v. Santos*, 741 F.2d 1167, 1169

21  (9th Cir. 1984) (per curiam) (petitioner's disagreement with counsel's tactical decisions cannot

22  form the basis of an ineffective assistance claim); *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th

23

24

1   Cir. 1984) (tactical decisions are not ineffective assistance simply because, in retrospect, better

2   tactics were available).

3          The Court finds that petitioner has failed to show that Division Two's resolution of his

4   argument that counsel performed deficiently was an unreasonable application of federal law or

5   an unreasonable determination of the facts.

6          Accordingly, petitioner's first ground for relief is not persuasive.

7   **III.  Ground Two:  "Street Gang" Aggravating Factor**

8          Petitioner's second ground for relief is that there was not sufficient evidence to support

9   the street gang aggravating factor because there was no evidence presented at trial that the

10  murder advanced a gang's interests.  *See* Dkt. 8, at 18.

11              **A.  Legal Standard**

12         Due process forbids conviction except upon "proof beyond a reasonable doubt."  *See*

13  *Jackson v. Virginia*, 443 U.S. 307, 318 (1979).  "Other than the fact of a prior conviction, any

14  fact that increases the penalty for a crime beyond the prescribed statutory maximum" or

15  "increases the mandatory minimum [sentence] is an 'element' that must be submitted to the jury"

16  and proved beyond a reasonable doubt.  *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000);

17  *Alleyne v. United States*, 570 U.S. 99, 103 (2013).

18         "[T]he relevant question is whether, after viewing the evidence in the light most

19  favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

20  the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis

21  in original).  This review is to be made viewing the evidence in the light most favorable to the

22  prosecution and deferring to the trier of fact to resolve conflicts in the evidence, to draw

23  reasonable inferences from the evidence, and to weigh the evidence.  *See id.*  "Under *Jackson*,

24

1    federal courts must look to state law for the substantive elements of the criminal offense, but the

2    minimum amount of evidence that the Due Process Clause requires to prove the offense is purely

3    a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).  Direct evidence of

4    guilt is not required; "circumstantial evidence can form a sufficient basis for conviction." *United*

5    *States v. Yoshida*, 303 F.3d 1145, 1151 (9th Cir. 2002).

6        "A federal court 'may not overturn a state court decision rejecting a sufficiency of the

7    evidence challenge simply because the federal court disagrees . . . [but] only if the state court

8    decision was objectively unreasonable.'" *Lucero v. Holland*, 902 F.3d 979, 991 (9th Cir. 2018)

9    (quoting *Coleman*, 566 U.S. at 651), *cert. denied*, 139 S. Ct. 1180).  "[T]he deferential standard

10   under AEDPA 'is difficult to meet because it was meant to be.'" *Id.* (quoting *Sexton v.*

11   *Beaudreaux*, ––– U.S. –––, 138 S.Ct. 2555, 2558 (2018) (per curiam)).

12                          **B.  Facts Related to Ground Two**

13       The State charged petitioner with first degree murder with the "aggravating

14   circumstance" of committing the murder "with the intent to directly or indirectly cause any

15   benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as

16   defined in RCW 9.94A.030, its reputation, influence, or membership."  RCW 9.94A.535(3)(aa).[2]

17       Petitioner challenged the sufficiency of the evidence to support the street gang

18   aggravating factor in his PRP, but Division Two affirmed.  *See* Dkt. 9-1, at 456.  In its ruling

19   denying review, the state supreme court—the last state court to issue a reasoned decision on the

20   matter—concluded that Division Two's holding was correct and that there was evidence that,

21

22

23   _____

24       [2] Again, although this statute has been amended multiple times since 2012, the relevant
     wording has remained the same.

viewed in the light most favorable to the State, supported the jury's conclusion that the shooting was intended to benefit the reputation of a gang:

> Specifically, Mr. Pitts was a member of a rival gang and had referred to Mr. Horton using a disrespectful term. And after the murder, Mr. Horton stated that Mr. Pitts was part of a rival gang and "that's what did it." [Citation omitted.] The Court of Appeals held that this evidence supported an inference that a street gang member's retaliation for disrespect from a rival gang member would increase the reputation of the gang and enhance the member's gang status. Mr. Horton characterizes this as mere speculation, but the Court of Appeals applied the correct legal principles, and its holding is sustainable. . . .

Dkt. 9-1, at 456.

## C. Discussion

During the second trial, the jury heard a recording of an investigator's interview with petitioner. Dkt. 9-3, at 669–70. In this interview, petitioner repeatedly identified himself as a "Mob man" and former Gangster Disciples gang member. Dkt. 9-4, at 625, 632, 636, 644. He also repeatedly referred to Pitts' membership in the Crips and stated that Pitts had disrespected him, was "test[ing] [petitioner's] gangsta," and "got on" him on the night of the shooting because of petitioner's gang affiliation. *See* Dkt. 9-4, at 628, 632, 636, 650, 653. Petitioner stated that that evening, Pitts had called petitioner "cuz" and had said that petitioner was in a "Crip neighborhood." Dkt. 9-4, at 632, 633. Another person who had been present on the night of the shooting also testified that he recalled petitioner making a Gangster Disciples gang sign to Pitts. Dkt. 9-3, at 572, 613. And one of the officers who arrested petitioner testified that when he was arrested, petitioner said "that the guy in the parking lot [the victim] 'was part of the Hilltop Crips and that's what did it.'" Dkt. 9-2, at 389.

Further, the investigator testified that "mob" was a term for "gang" in Gangster Disciples culture. Dkt. 9-3, at 671. The investigator stated that if a Crip gang member called a Gangster Disciples gang member "cuz," "[t]hat would be total disrespect" and that minor acts of disrespect

1    would lead to retaliation to preserve the gang's reputation.  Dkt. 9-3, at 673, 706–07.  According

2    to the investigator, if a "hard-core Gangster Disciple" did not respond to disrespect, "[t]he entire

3    gang would look at him as weak . . . and it would affect the entire gang, not only their reputation,

4    but also to him from them."  Dkt. 9-4, at 44–45.

5         Finally, the Court notes that certain evidence presented at trial supported the conclusion

6    that petitioner was more recently involved with the Gangster Disciples than he portrayed.  The

7    State presented evidence that petitioner had gotten a face tattoo of a Gangster Disciples-

8    associated symbol approximately two years before the crime, and petitioner referred to himself

9    as a current gang member in the interview with the investigator.  Dkt. 9-3, at 688, 694; *see* Dkt.

10   9-4, at 653.

11        This, viewed in the light most favorable to the State, supports the conclusion that the

12   shooting was indirectly for the benefit of a gang because the shooting was motivated at least in

13   part to preserve a gang's reputation in response to disrespect from a member of another gang.

14   Contrary to petitioner's arguments, the investigator's testimony that failure to respond to

15   perceived disrespect made a gang appear weak is evidence from which a rationale trier of fact

16   could reasonably infer that petitioner shot Pitts with the intent to avoid damage to the Gangster

17   Disciples' reputation.

18        Petitioner argues that there is no evidence "that any gang member anywhere was aware of

19   what happened or why.  The State did not present any evidence that Horton's former gang's

20   influence was actually enhanced; that any active gang member perceived it was enhanced; or that

21   Horton said or did anything to make his actions known to anyone, much less his former gang."

22   Dkt. 4, at 9–10.  But the gang aggravator statute does not require that the gang's prestige was, in

23

24

REPORT AND RECOMMENDATION - 16

1  fact, enhanced—it merely requires that the crime was committed with the intent to benefit the

2  gang, regardless of whether that intent was ultimately successful.

3      Petitioner further argues that the State failed to prove that he was a current member of the

4  Gangster Disciples.  Dkt. 8–9.  Again, there is no requirement that the State prove this to

5  establish the gang aggravator.  Their was ample evidence that petitioner maintained at least some

6  level of affiliation with the Gangster Disciples, and the jury could reasonably have concluded

7  that petitioner intended to benefit his former gang, particularly where petitioner repeatedly stated

8  that he perceived Pitts to be challenging petitioner based on his gang ties.

9      Finally, petitioner argues that the evidence was that there was no rivalry between the

10  Gangster Disciples and Pitts' gang.  Dkt. 12, at 9.  But it was the province of the jury to weigh

11  the evidence and draw reasonable inferences therefrom.  Based on the trial testimony and

12  evidence, the jury reasonably could have concluded that even if there were no ongoing rivalry or

13  war between the gangs, Pitts disrespected petitioner based on his association with the Gangster

14  Disciples and prompted petitioner's fatal response.

15      In reviewing the sufficiency of the evidence, a Court must defer to the jury's findings,

16  including rational inferences from the evidence, so long as there is at least some evidence that

17  viewed in the light most favorable to the State, supports the inference.  *See Lucero v. Holland*,

18  902 F.3d 979, 993 (9th Cir. 2018) (reversing on the basis that only "sheer speculation" supported

19  an essential element of the crime), *cert. denied,* 139 S. Ct. 1180 (2019).  Here, the jury did not

20  rely on pure speculation that the crime was for the benefit of a gang because there was sufficient

21  evidence, as summarized above, to support that petitioner shot Pitts with the intent to indirectly

22  benefit his former gang's reputation.  *Accord Johnson v. Montgomery*, 899 F.3d 1052, 1058 (9th

23  Cir. 2018) ("The outward manifestations of gang involvement—. . . visible tattoos, the use of

24

gang-affiliated lingo, the brazen daylight timing, and the apparent comfort with being observed—were sufficient for a jury to infer that the crime was meant to send a message to the public about gang brutality and control.")  It was therefore not objectively unreasonable for the state court to conclude that there was sufficient evidence that the crime was committed to indirectly benefit a gang.

Petitioner's second ground for relief lacks merit.

## CERTIFICATE OF APPEALABILITY

Petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability (COA) from a district or circuit judge.  A certificate of appealability may issue only if petitioner has made "a substantial showing of the denial of a constitutional right."  *See* 28 U.S.C. § 2253(c)(2).  Petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (*citing Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Pursuant to this standard, this Court concludes that petitioner is entitled to a certificate of appealability with respect to this petition.

## CONCLUSION

The petition for habeas corpus should be denied, and the Court should issue a certificate of appealability and close the case.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of *de novo*

1    review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a result in a waiver

2    of those objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Miranda v.*

3    *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

4    imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

5    September 18, 2020, as noted in the caption.

6        Dated this 28th day of August, 2020.

7

8

9

10                                                 J. Richard Creatura
                                                   United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

REPORT AND RECOMMENDATION - 19